IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 2, 2003

**REGINALD GARNER BROWN v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 97-A-429     Cheryl Blackburn, Judge**

_____

**No. M2002-02980-CCA-R3-PC - Filed January 30, 2004**

_____

A Davidson County jury convicted the Petitioner, Reginald Garner Brown, of one count of first degree felony murder, one count of especially aggravated kidnapping, one count of aggravated robbery and one count of aggravated burglary. The trial court sentenced the petitioner as a Range I offender to consecutive terms of life with the possibility of parole for murder, twenty-five years for especially aggravated kidnapping, twelve years for aggravated robbery and six years for aggravated burglary. On direct appeal, this Court affirmed the convictions, and the Tennessee Supreme Court denied the Defendant's application for permission to appeal. The Petitioner then sought post-conviction relief in the trial court, alleging that he was denied effective assistance of counsel. Following a hearing, the post-conviction court dismissed the petition. Finding no error, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ALAN E. GLENN, JJ., joined.

Mike J. Urquhart, Nashville, Tennessee, for the appellant, Reginald Garner Brown.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Jennifer L. Bledsoe, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Roger Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Factual Background**

This Court summarized the underlying facts of the Petitioner's case on direct appeal as follows:

In the late evening hours of April 1, 1996, Elton and Christine Maupins were lounging in the bedroom of their home when they heard people running down the

hallway. Mr. Maupins jumped up, closed the bedroom door and instructed his wife to call the police. Instead, [Ms.] Maupins dialed the operator, but before she had an opportunity to speak with the operator, gunshots were fired through the bedroom door, striking Mr. Maupins in the chest. The door opened, and two men clad in dark clothing pushed inside, demanding money from the victims. Mr. Maupins informed the intruders that they had no money in the house and he then fell silent.

[Ms.] Maupins described the intruders at trial. She testified that "Intruder Number One" was wearing a blue jacket and dark pants, a black or navy baseball cap, and black gloves. "Intruder Number Two" wore a dark blue and green sweatshirt with a hood and surgical gloves. ["]Intruder Number One["] carried a handgun, and ["]Intruder Number Two["] carried a shotgun. Although the intruders wore bandanas across their faces, [Ms.] Maupins testified that she could see both individuals' eyes.

The perpetrators began searching the drawers in the Maupins' bedroom for money and pushed the mattress from the bed. When they could not locate any money, ["]Intruder Number One["] pulled a trunk from the closet and attempted to open it. The trunk would not open, so ["]Intruder Number Two["] directed [Ms.] Maupins to the kitchen at gunpoint to find a hammer. As they walked to the kitchen, [Ms.] Maupins observed a third man standing in her living room. According to [Ms.] Maupins, ["]Intruder Number Three["] was shorter than the other two men and was dressed in black clothing, a ski mask and surgical gloves. While [Ms.] Maupins searched for the hammer in the kitchen, a fourth man walked through the back door. [Ms.] Maupins described this man as "husky" and bigger than the rest. Although ["]Intruder Number Four["] was not wearing a mask, [Ms.] Maupins was unable to see his face.

["]Intruder Number Two["] led her back into her bedroom where her husband's body remained in the doorway. ["]Intruder Number One["] had shot the lock off of the trunk and off of a safe, but did not find any money. ["]Intruder Number One["] then called someone on the telephone, complaining to the person on the other end that there was no money in the Maupins' home. When he finished his telephone call, ["]Intruder Number One["] snatched the cord from the telephone and tied [Ms.] Maupins' hands with the cord. ["]Intruder Number One["] threatened to kill [Ms.] Maupins if she identified any of the men, and then they left through the back door.

[Ms.] Maupins testified at trial that the intruders left with approximately $70, which was taken from her purse and her husband's pockets. Mr. Maupins died as a result of the gunshot wound to his chest.

The next day, a detective with the police department showed [Ms.] Maupins a photo array in the hope that she might identify the perpetrators of the crime.

Although she was not certain, she indicated that the appellant, whose picture was in the array, appeared to be one of the intruders. [Ms.] Maupins testified that she was afraid to identify anyone the day after the incident, but tentatively identified the appellant's photo because she recognized his eyes.

At trial, [Ms.] Maupins positively identified the appellant as ["]Intruder Number One[."] She stated that she had the most contact with ["]Intruder Number One["] and was able to view him from a close distance. She further testified that, at one point during the incident, ["]Intruder Number One's["] hat fell off of his head, and when she reached to hand the hat to him, she was able to catch a glimpse of him. [Ms.] Maupins stated that she was certain that the appellant was ["]Intruder Number One["] because his eyes were very familiar to her.

The state presented evidence at trial of the appellant's presence near the victims' home on the evening of April 1. Dwight Chambers, the brother of the victim, testified that at approximately 6:30 p.m., he gave the appellant a ride to Jack's Market, which is within two (2) blocks of the Maupins' home. In addition, Reba Holmes stated that she observed the appellant walking toward the Maupins' home with two (2) other men approximately fifteen (15) minutes prior to the robbery.

The appellant presented an alibi defense at trial. Samuel Douglas, a friend of the appellant, testified that he and the appellant habitually socialized on the first of every month. He stated that the appellant received an SSI check on the first of the month, and they typically used the money to purchase alcohol and/or drugs. Douglas testified that on April 1, the appellant was at his (Douglas') home until 4:00 p.m., left, then returned at approximately 9:00 p.m. Douglas stated that the appellant did not leave until 2:00 a.m. on the following morning. Although Douglas was certain that he was with the appellant on April 1, he could not testify as to which day of the week the events took place. Additionally, Douglas could not distinguish the events on April 1 from the events on the first of any other month.

The jury found the appellant guilty of one (1) count of first degree felony murder[1], one (1) count of especially aggravated kidnapping, one (1) count of aggravated robbery and one (1) count of aggravated burglary. The trial court sentenced the appellant as a Range I offender to consecutive terms of life for murder, twenty-five (25) years for especially aggravated kidnapping, twelve (12) years for aggravated robbery and six (6) years for aggravated burglary.

---

[1]The appellant was also charged with premeditated first degree murder. The jury returned a guilty verdict on the lesser offense of second degree murder, and the trial court merged the second degree murder conviction into the first degree felony murder conviction.

<u>State v. Reginald G. Brown</u>, No. M1999-00002-CCA-R3-CD, 2000 WL 804662, at *1-3 (Tenn. Crim. App., at Nashville, June 23, 2000), <u>perm.</u> <u>app.</u> <u>denied</u> (Dec. 7, 2000).

On direct appeal, this Court affirmed the convictions, and the Tennessee Supreme Court denied the Defendant's application for permission to appeal. The Petitioner filed a <u>pro</u> <u>se</u> petition for post-conviction relief. The post-conviction court appointed Mike J. Urquhart to represent the Petitioner. In his amended petition, the Petitioner alleged that he was denied effective assistance of counsel at his trial. The Petitioner asserted that he was denied effective assistance of counsel when the Petitioner's trial counsel ("Counsel") failed to: (1) adequately investigate prior statements made by Christine Maupins to her mother-in-law, Loistine Jackson, regarding the identification of the intruders; (2) make an offer of proof as to the testimony of Jackson; (3) adequately investigate witnesses Dwight Chambers and Reba Holmes; and (4) cross-examine Chambers or Holmes at trial regarding their credibility. After hearing the evidence, the trial court issued an order denying the petition for post-conviction relief, and the Petitioner filed a timely notice of appeal.

The following evidence was presented at the post-conviction hearing: Counsel testified that she was court-appointed to represent the Petitioner on two different matters. Counsel stated that she requested and was granted funds by the court to hire a private investigator for the Petitioner's defense. Counsel explained that she believed that Christine Maupins had given statements at the photo lineup that she could not positively identify the Petitioner but there was no statement to that effect written under the actual photo lineup. Counsel explained that, when an individual gives a statement during a photo lineup, "those statements . . . are written under the photo lineup itself." Counsel stated that she spoke with Detective Postiglione about the Petitioner's case, but could not remember the details of the conversation. Counsel further stated that her private investigator spoke with Maupins concerning Maupins' statements during the photo lineup, but Counsel could not remember the details of that conversation either.

Counsel testified that the identification of the Petitioner was the "main issue" of the trial, but stated that, prior to the trial, she "was not sure" whether Maupins would be able to identify the Petitioner at trial. Counsel explained, "[Y]ou just never know what a witness is going to say when they get in the courtroom in front of the jury, so I was not sure as to . . . whether she could identify [the Petitioner]." She explained that Maupins stated that the intruder was "about 5' 7", 5' 8", 5' 9". . ." but that the Petitioner was a "very tall individual."

Counsel also testified that Maupins identified the Petitioner "because of his eyes" at the trial, but that, during the pre-trial investigation, the private investigator never mentioned Maupins talking about the perpetrator's eyes. Counsel explained that she did not personally speak with Maupins before the trial because it had been her experience that "it's better to have someone that is not a lawyer . . . talk with them and just have a friendly conversation . . . ." Counsel conceded that, at the trial, Maupins explained that she had a difficult time initially identifying the Petitioner because he had threatened to kill her, but Counsel explained that Maupins did not tell this to Counsel's private investigator.

-4-

Counsel testified that at the trial, Loistine Jackson was prepared to testify that she knew the Petitioner and did not think he had committed the crimes for which he was accused. She explained that Jackson would have further testified about some prior inconsistent statements made by Maupins. Counsel explained that Jackson did not testify at the trial because the trial court held that Counsel had not laid the proper foundation to allow Jackson to testify. Counsel recalled that there was a jury-out hearing in which she argued that she had asked Maupins enough questions about her statements to allow Jackson to testify about prior inconsistent statements, but that the trial court disagreed. Counsel explained, "I thought I had solicited enough information from Mrs. [M]aupin in order to get Ms. Jackson on the witness stand." Counsel testified that she did not make an offer of proof because she believed that "anything I could put on . . . would be cumulative." The State agreed that Counsel should have made the offer of proof but argued that the Petitioner needed to show prejudice. Counsel acknowledged that "in hindsight" she made a mistake by not making an offer of proof as to Jackson's testimony.

Counsel stated that she attempted to investigate Reba Holmes, but that the investigation "hit a dead end." She explained that she did not subpoena Holmes's employment records because she did not know what Holmes was going to testify to at the trial, having been unable to interview Holmes. Counsel admitted that Holmes's time records would have been beneficial at the trial because the records indicated that Holmes worked until 11:00 p.m. on the night of the incident. Counsel explained that she could have used the time records to impeach Holmes.

Counsel stated that she could not recall her examination of Dwight Chambers, the victim's brother. Counsel testified that she did not feel the need to cross-examine Chambers on his bias because a "jury can see a bias if it's the relative of a murdered victim that's testifying. Juries are pretty intelligent."

On cross-examination, Counsel testified that she has been licensed to practice law since the spring of 1993 and that, during the period of 1993 through 1997, approximately ninety percent of her practice consisted of criminal law. Counsel stated that she was appointed to represent the Petitioner on two separate and unrelated charges: the first appointment for this case and the second appointment for an attempted murder charge. She explained that the attempted murder case was tried prior to the present case, which she believed was an attempt by the State to establish an aggravated circumstance for the present case.

Counsel testified that she worked with the Petitioner in developing trial strategies for both cases but described the Petitioner as "very difficult to work with." She explained that she would "try to explain the procedure to him, the rules of evidence or the rules of criminal procedure and how the courtroom is run, and he didn't want to . . . follow the rules, because it wasn't going to be fair to his case." Counsel conceded that the Petitioner provided her with names of potential alibi witnesses who she or the private investigator could contact. She stated that their alibi witness testified at the trial, and that, ultimately, it was an issue of who the jury believed. Counsel testified that she "vaguely" recollected that Holmes testified that she left work early on the night of the incident, but

that the State did not provide her with Holmes's employment records and she could not discover this because Holmes refused to talk with her or her private investigator.

The Petitioner testified that Counsel failed to investigate two witnesses: Dwight Chambers and Reba Holmes. The Petitioner specifically alleged that Counsel did not talk with either witness "[b]ecause she never mentioned that she was going to recall them." The Petitioner explained that Counsel should have investigated whether Holmes worked until 11:00 p.m. as indicated by her work records or until 9:00 p.m. as she testified. He further explained that Holmes was a late "add-on" and that Counsel never issued a subpoena for Holmes's time records from work. The Petitioner testified that Counsel failed to investigate Chambers because "[s]he said that his testimony would have been irrelevant." The Petitioner further testified that Maupins had "a lot of discrepancies and inconsistencies in her testimony."

The Petitioner stated that Jackson was never allowed to testify, but if she had, she would have testified that Maupins "never saw any eyes or something of that nature or never spoke about eyes." The Petitioner explained that, because he was unable to call Jackson as a defense witness, he was unable to create reasonable doubt which "created structural defects" in the trial. The Petitioner admitted that the issues sent up to the Court of Criminal Appeals "didn't hold very much water."

The Petitioner testified that Counsel failed to adequately investigate all the charges against him. The Petitioner alleged that Counsel did not attend the police interview with Maupins and that Counsel never heard the taped conversation between Maupins and the police. The Petitioner explained, "[I]t's standard practice that there's tape recorded conversations. A lawyer is supposed to [be] present during these photographic procedures. And . . . [Counsel] was never there to . . . actually hear what the conversation was at the time of the interrogation with Ms. Christine [M]aupin."

The Petitioner stated that Counsel should have objected to Maupins's in-court identification of the Petitioner. The Petitioner testified that the identification was a violation of his right to due process because Maupins had attended a prior court proceeding of his for the sole purpose of viewing him. The Petitioner acknowledged that Maupins' prior viewing of him was disclosed during the trial. The Petitioner then testified that Counsel was ineffective for allowing the first and second-degree murder charges to be merged "because the jury had to absolutely guess on what it takes in the law for first-degree murder . . . ." The Petitioner stated that Counsel was also ineffective for failing to request a bill of particulars because they "had to wait and see this and that" rather than being able to know "exactly where to go" in preparing a defense.

On cross-examination, the Petitioner admitted that the work records showed the hours for which Holmes was paid; not necessarily for the hours she worked. The Petitioner stated that Holmes lied about leaving work early on the night of the incident. The Petitioner testified that Loistine Jackson thought very highly of him.

Loistine Jackson testified that she spoke with Maupins regarding the incidents surrounding the death of Jackson's son, Elton Maupins. Jackson testified that Maupins told her that four intruders entered the house, three of whom were wearing masks. Jackson stated that Maupins described the men as short, but that she could not identify them nor did Maupins give her particular descriptions of any of the intruders. Jackson explained that Maupins never told her anything about any of the intruders' eyes. Jackson testified that Maupins knew the Petitioner prior to the incident. She further testified that Maupins never told her of any threats made against her.

On cross-examination, Jackson stated that she knew the Petitioner through her son, the victim. Jackson explained that since the incident, things between her and Maupins, her daughter-in-law, have not been good. Jackson admitted that, while she did not hear Maupins testify, Maupins had told her prior to the trial that one of the intruders did not wear a mask. Jackson explained that while Maupins knew the Petitioner, she never saw the two of them together. On redirect, Jackson testified that she had been prepared to provide the same testimony at the trial that she had provided during the post-conviction hearing.

The Court then questioned Jackson. Jackson testified that she was at the trial and available to testify and was sitting outside of the court room during Maupins' testimony. She explained that, prior to the trial, she asked Maupins if Maupins could positively identify any of the intruders and that Maupins said that she could not identify the intruders. Jackson explained that she and Maupins have been on bad terms for some time and that she had not seen Maupins in "two or three months." Jackson stated that she and Maupins were on bad terms even prior to the trial "because [Jackson] was asking too many questions." Jackson testified that did not believe Maupins's version of what transpired "at all."

Following the presentation of the evidence, the post-conviction court found that the Petitioner was not denied effective assistance of counsel and dismissed his petition. The post-conviction court held that Counsel adequately investigated Chambers and Holmes and that it was a reasonable strategic decision not to cross-examine Chambers as to his bias. The post-conviction court concluded that this issue was without merit. Further, the post-conviction court held that Maupins's statements to Jackson were not inconsistent with her testimony at trial and, accordingly, Jackson's testimony offered by the Petitioner was cumulative. Additionally, the post-conviction court found that Jackson's bias and "her poor relationship" with Maupins would have been introduced by the State. The post-conviction court concluded that the Petitioner failed to carry his burden of proof and denied his petition.

## II. Analysis

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103 (1997). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (1997). A post-conviction court's factual findings are subject to a de novo review by this Court; however,

we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at 457. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to de novo review. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, section 9, of the Tennessee Constitution. Id.; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461. In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

On appeal, the Petitioner argues that the post-conviction court erred by finding that the Petitioner was not denied effective assistance of counsel. Specifically, he asserts the post-conviction court erred when it found that Counsel was not ineffective by failing to adequately investigate prior inconsistent statements made by Maupins to her mother-in-law, Loistine Jackson, regarding the identification of the intruders, for failing to make an offer of proof as to the testimony of Jackson, and for failing to adequately investigate witnesses Chambers and Holmes, and for failing to cross-examine either Chambers or Holmes at trial regarding their credibility.

## A. Prior Inconsistent Statements and Offer of Proof

The Petitioner alleges that Counsel was ineffective for failing to adequately investigate prior inconsistent statements made by Maupins to her mother-in-law, Loistine Jackson, regarding the identification of the intruders and that Counsel was ineffective for failing to make an offer of proof at trial as to the testimony of Jackson. The State agrees that Counsel should have made an offer of proof concerning Jackson's testimony at the trial or called Jackson as a witness at the hearing on the motion for new trial. However, the State argues that Jackson's testimony at the post-conviction hearing was not inconsistent with Maupins' testimony at the trial, making Jackson's testimony cumulative, and thus the Petitioner has failed to show prejudice.

First, we conclude that Counsel adequately investigated prior inconsistent statements made by Maupins to her mother-in-law, Jackson, regarding the identification of the intruders. Counsel testified at the post-conviction hearing that it was through investigating Maupins' identification of the Petitioner and interviewing Jackson that she learned that there was a possible problem with Maupins' identification of the Petitioner. Accordingly, Counsel had Jackson prepared to testify at the trial that she had spoken with Maupins several times prior to the trial and that Maupins told her she could not positively identify the intruders. Jackson also would have testified at trial that Maupins never mentioned anything to her about the eyes of one of the intruders. However, the trial court did not permit Jackson to testify because Counsel did not lay a proper foundation for the admission of this testimony.

Counsel testified that at trial a jury-out hearing was conducted during which Counsel argued that she had asked Maupins enough questions about her statements to allow Jackson to testify about prior inconsistent statements. Counsel testified at the post-conviction hearing that the trial court disagreed. Counsel explained, "I thought I had solicited enough information from [M]aupins in order to get Ms. Jackson on the witness stand."

While the trial court held that Counsel failed to lay a sufficient foundation for Jackson to testify as to Maupins' allegedly prior inconsistent statements, we must evaluate the questionable conduct from Counsel's perspective at the time of her conduct with "a strong presumption that [her] conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462; Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Furthermore, Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). While the trial court felt that Counsel failed to lay a proper foundation, her conduct at the time fell "within the wide range of reasonable assistance." Burns, 6 S.W.3d at 462. Moreover, even if we were to find that Counsel erred, the Petitioner has presented no evidence of prejudice or that the outcome would be different. Accordingly, we conclude that the Petitioner is not entitled to post-conviction relief on this issue.

Next, we conclude that Counsel's decision not to make an offer of proof as to the testimony of Jackson "fell below an objective standard of reasonableness," because by failing to do so, Counsel

-9-

failed to preserve Jackson's testimony for appellate review. Strickland, 466 U.S. at 688; Tenn. R. Evid. 103(a)(3). However, although we find that Counsel erred, we agree with the post-conviction court that the Petitioner failed to meet his burden of proving that he was prejudiced by Counsel's failure to make an offer of proof as to the testimony of Jackson. The Petitioner presented no evidence of prejudice. The Petitioner alleges that Counsel should have made an offer of proof as to the testimony of Jackson; however, when Jackson testified at the post-conviction hearing, her testimony did not contradict Maupins' testimony at trial.

Maupins testified that she was unable to positively identify the Petitioner at the initial photo lineup. She stated that the police "brought the snapshots by, and I identified him, but I wasn't for sure . . . I was scared." She further explained that she identified the Petitioner but was "not positive . . . he looked like the one because I put the card up over, the snapshot from [here] all the way down. It's the eyes."

Jackson testified at the post-conviction hearing that Maupins gave her a general description of the intruders, including the fact that one of them did not wear a mask, but that Maupins was unable to identify them or give Jackson particular descriptions of any of the intruders. Jackson stated that Maupins never told her anything about the intruders' eyes or told her of any threats made against her. When questioned by the Court, Jackson explained that prior to the trial she repeatedly asked Maupins if she could identify any of the intruders and Maupins said that she could not. On cross-examination, Jackson admitted her relationship with Maupins was strained since the incident. Jackson explained to the Court that she and Maupins had been on bad terms for some time, even prior to the trial, and that she had not seen Maupins in "two or three months."

The Petitioner failed to meet his burden of proving prejudice by Counsel's failure to make an offer of proof as to the testimony of Jackson. Jackson's testimony did not contradict Maupins' testimony. Maupins testified that she identified the Petitioner in a photo lineup but "wasn't for sure" in part because she was afraid of the threat made by the Petitioner that if she identified any of the intruders he would "come back" and kill her. Furthermore, as noted by the post-conviction court, Jackson would have been cross-examined as to her bias against Maupins and the "strained" relationship between the two of them. Accordingly, we conclude that the Petitioner failed to prove prejudice. The Petitioner failed to show a reasonable probability that, but for Counsel's failure to make an offer of proof as to the testimony of Jackson, the fact finder would have had reasonable doubt regarding the Petitioner's guilt "sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694-95; see also Harris, 875 S.W.2d at 665. Therefore, the Petitioner is not entitled to post-conviction relief on this issue.

### B. Investigation of Witnesses

The Petitioner alleges that Counsel was ineffective for failing to adequately investigate witnesses Chambers and Holmes and failing to cross-examine either witness at trial regarding their credibility.

At the post-conviction hearing, Counsel testified that she attempted to investigate Holmes but that Holmes was unwilling to speak with her or the private investigator. Counsel explained, "I attempted to contact Holmes at work on several occasions, and she would not speak with me." Further, Counsel explained that she did not subpoena Holmes's time records because she did not know what Holmes was going to testify to at trial. She explained, "I had no idea that anything like that was going to be an issue." Counsel admitted that the time records would have been helpful in impeaching Holmes's credibility during the trial, but she testified that, at the trial, Holmes stated that she left work early on the night of the incident. The Petitioner presented no evidence to contradict Holmes's statement.

The Petitioner argues that the time record proves that Holmes was working on the night of the incident and, accordingly, could not have witnessed what she testified to at the trial. The trial court noted that these time records were Brady material which Counsel had requested from the State but which were not turned over to her prior to the trial. However, the trial court also noted that the time records were not "time sheets" which showed the actual hours worked by Holmes, rather they were time records which indicated the hours for which she was paid. The Petitioner admitted on cross-examination that the time records indicated the hours for which Holmes was paid rather than the hours she worked. When asked if Holmes had testified at trial that she left early from work on the night of the incident, the Petitioner said, "Yeah, she lied." Beyond the Petitioner's allegation that Holmes lied when she stated that she left work early on the night of the incident, the Petitioner presented no evidence to contradict Holmes's testimony.

Concerning the examination of Dwight Chambers, Counsel testified at the post-conviction hearing that she made a tactical decision not to cross-examine Chambers as to his bias. She explained that a "jury can see a bias if it's the relative of a murdered victim that's testifying. Juries are pretty intelligent." Counsel's decision not to cross-examine Chambers as to his bias must be evaluated from the attorney's perspective at the time and within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; Mitchell, 753 S.W.2d at 149; Cooper, 849 S.W.2d at 746; Hellard, 629 S.W.2d at 9. Counsel shall not be deemed ineffective merely because a different strategy might have produced a different result. Williams, 599 S.W.2d at 279-80.

We conclude that Counsel adequately investigated witnesses Chambers and Holmes, and her decision not to cross-examine either witness at trial regarding their credibility was a tactical decision that fell "within the wide range of reasonable professional assistance." See Burns, 6 S.W.3d at 462. Moreover, the Petitioner has failed to show a reasonable probability that had Counsel cross-examined either witness, the jury would have had reasonable doubt regarding the Petitioner's guilt. See Strickland, 466 U.S. at 695. In our view, the Petitioner has failed to show a reasonable probability of reasonable doubt "sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Therefore, the Petitioner has failed to satisfy the "prejudice prong" of Strickland.

Accordingly, we conclude that the Petitioner is not entitled to post-conviction relief on this issue.

### III.  Conclusion

Thus, we conclude that the post-conviction court properly found that the Petitioner failed to prove ineffective assistance of counsel by clear and convincing evidence and that Counsel fully discharged her duties as the Petitioner's attorney.  Accordingly, the judgment of the post-conviction court is AFFIRMED.

_____

ROBERT W. WEDEMEYER, JUDGE